John H. SULLIVAN, and Roy R. Anderson, Individually, and on behalf of themselves and all other resident citizens and qualified electors of Henderson County, Tennessee, similarly situated, Plaintiffs,

v.

Gentry CROWELL, Secretary of State of the State of Tennessee, Ray Blanton, Governor of the State of Tennessee, Brooks McLemore, Attorney General of the State of Tennessee, David Collins, Coordinator of Elections of the State of Tennessee, and James E. Harpster, Jack C. Seaton, Tommy Powell, Richard Holcomb and Lytle Landers, Commissioners of the State Board of Elections, Defendants.

Alice ALGOOD, James A. Choate, Kenneth L. Fisher, Thomas Woodall, and Jason O. Young, Jr., Individually, on behalf of themselves and all other resident citizens and qualified electors of Benton, Carroll, Dickson, Dyer, Gibson, Henry, Hickman, Houston, Humphreys, Lake, Lewis, Maury, Montgomery, Obion, Stewart and Weakley Counties in Tennessee, similarly situated, Plaintiff,

v.

Gentry CROWELL, Secretary of State of the State of Tennessee, Ray Blanton, Governor of the State of Tennessee, Brooks McLemore, Attorney General of the State of Tennessee, David Collins, Coordinator of Elections of the State of Tennessee, and James E. Harpster, Jack C. Seaton, Tommy Powell, Richard Holcomb, and Lytle Landers, Commissioners of the State Board of Elections, Defendants.

Jack E. NELSON, Jr., and Richard Mader, Individually, on behalf of themselves and all other resident citizens and qualified electors of Knox County, Tennessee, similarly situated, Plaintiffs,

v.

Gentry CROWELL, Secretary of State of the State of Tennessee, Ray Blanton, Governor of the State of Tennessee, Brooks McLemore, Attorney General of the State of Tennessee, David Collins, Coordinator of Elections of the State of Tennessee, James E. Harpster, Jack C. Seaton, Tommy Powell, Richard Holcomb, and Lytle Landers, Commissioners of the State Board of Elections, and William Banks, C. Gordon Baer, Michael Y. Rowland, Edna Smyre, and Richard W. Krieg, Commissioners of the Knox County Election Commission, Defendants.

Civ. Nos. 77–1067E, 77–1082E and 77–2691.

United States District Court, W. D. Tennessee, W. D.

Feb. 3, 1978.

Robert Walker, Heiskell, Donelson, Adams, Williams & Kirsch, John L. Ryder, Laughlin, Halle, Regan, Clark & Gibson, Memphis, Tenn., for plaintiffs.

Kenneth R. Herrell, Asst. Atty. Gen., State of Tennessee, Nashville, Tenn., for all defendants except Knox County Election Commissioners.

Charles A. Maner, Jr., Knox County Law Director, Dale C. Workman, Knoxville, Tenn., for Knox County Election Commission.

Before: PHILLIPS, Chief Circuit Judge, BROWN, Chief District Judge, and WELLFORD, District Judge.

BAILEY BROWN, Chief District Judge.

These actions were brought to challenge the constitutionality of several statutes adopted by the legislature of the State of Tennessee in 1976 and 1977, which effected a reapportionment of voters in several legislative districts throughout the state. The plaintiffs in the *Algood* case contend additionally that the use of a two-member legislative district violates the federal and state constitutions. The plaintiffs in the *Nelson* case, in addition to challenging the constitutionality of the reapportionment statute there involved, urge that the practice of the Knox County Election Commission in permitting some voters to remain registered in voting precincts in which they do not live violates the federal constitution and state legislation.

This three-judge court was impaneled to consider the constitutionality of the reapportionment statutes and the statutory two-member legislative district under the federal constitution. Because the three cases involve common questions of law and fact, they were consolidated. All three cases were submitted for decision on the basis of stipulations of fact, depositions, and answers to interrogatories on file, as well as briefs and oral argument on the legal issues involved.

## CLASS CERTIFICATION

Plaintiffs in all three cases seek declaratory and injunctive relief, and an award of attorneys fees under the Civil Rights Attorney's Fee Awards Act of 1976. Plaintiffs urge the importance of class certification to avoid problems of mootness. Defendants do not strongly oppose certification. The court feels that certification is proper under F.R.Civ.P. Rule 23(b)(2), providing the class is properly confined to those persons whose voting power is diluted by the present scheme of apportionment, and it is understood that class certification would in no event affect the amount of attorneys fees to be awarded. See *White v. Crowell*, 434 F.Supp. 1119 (W.D.Tenn.1977).

Accordingly, the court certifies the following classes:

1) In the *Sullivan* case, that class of persons eligible for voter registration in House Districts 72 and 80.

2) In the *Algood* case, that class of persons eligible for voter registration in House Districts 69, 75, 76 and 77, as to the constitutionality of the reapportionment statutes involved; and that class of persons eligible for voter reg-

istration in House Districts 76 and 77, as to the constitutionality under the federal and state constitutions of the two-member legislative district.

3) In the *Nelson* case, that class of persons eligible for voter registration in House Districts 14 and 16, as to the constitutionality of the reapportionment statute involved; and that class of persons eligible for voter registration in House Districts 13, 14, 15, 16, 17, 18 and 19, and not presently registered to vote in a precinct in which they do not reside, as to the non-resident registration issues presented.

## SULLIVAN

Apportionment among House Districts 65, 70, 72 and 80 was altered by the enactment on May 20, 1977 of Chapter 304 of the Public Acts of 1977, by the Tennessee General Assembly.

The effects of Chapter 304 on voter distribution within those four districts are demonstrated in the following table, which reflects changes in real population and in percentage variance from the "ideal" district of 39,638 voters.[1]

### Chapter 304 (Sullivan)

|  | Before Enactment | | After Enactment | |
|---|---|---|---|---|
|  | Population | % Variance | Population | % Variance |
| District 65 | 39,103 | − 1.35 | 35,816 | − 9.64 |
| District 70 | 39,993 | + 0.89 | 36,581 | − 7.71 |
| District 72 | 39,062 | − 1.45 | 44,449 | + 12.14 |
| District 80 | 39,870 | + 0.58 | 41,181 | + 3.89 |

■ Mathematical certainty is not required in the apportionment of state legislative districts, and greater flexibility may be constitutionally permissible for state legislative districts than for congressional districts. However, the equal protection clause of the Fourteenth Amendment requires that

a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable.

*Reynolds v. Sims*, 377 U.S. 533, 577, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964).

It is obvious that in adopting Chapter 304, the Tennessee General Assembly significantly increased population disparities among the four voting districts concerned. The maximum percentage variance[2] increased from 2.34 percent to 21.78 percent. The State has not attempted to equalize the populations of those districts as nearly as practicable; to the contrary, the State has moved away from equality. This substantial dilution of voting rights is constitutionally impermissible, in the absence of any legitimate justification. *Reynolds v. Sims*, supra; *White v. Crowell*, supra.

■ The court is aware that the creation of fairly large population differentials may be constitutionally permissible where they result from the even-handed implementation of a rational state policy. For example, the Supreme Court has held reasonable variations constitutional where they have resulted from an attempt to maintain existing political subdivision lines. *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1972).

In the case at bar, the State argues that in adopting the reapportionment measures at issue the General Assembly

has attempted to "put the counties back together" by taking a small number of magisterial districts of a county and isolated in a legislative district and combining them with the larger number of other districts in the county to which they all belong.

Brief of the Attorney General at 5. However, the record does not show that these reapportionment measures have significantly reduced the division of magisterial dis-

---

1. All figures are based on the results of the 1970 census. The parties have stipulated the use of 1970 census figures, and have entered stipulations as to the correct population figures for all districts involved in each case.

2. The maximum percentage variance is the percentage variance between the affected district with the highest population and the affected district with the lowest population.

tricts in the affected counties. Nor does the record show an attempt by the State to effect a statewide policy of "putting the counties back together." On this record, the court does not find any relationship between county unification and the reapportionment legislation before the court.

■ Accordingly, it is the conclusion of the court that Chapter 304 of the Public Acts of 1977 unconstitutionally infringes rights guaranteed to plaintiffs by the Fourteenth Amendment, since the effect of that legislation has been to substantially reduce population equality in legislative districts while serving no discernible rational state policy.

ALGOOD

Apportionment among House Districts 64, 67, 68, 69, 74, 75, 76, 77 and 78 was altered by the enactment on March 28, 1976 of Chapters 625 and 632 of the Public Acts of 1976, by the Tennessee General Assembly.

The following table demonstrates the effect of Chapters 625 and 632 on real population and percentage variances from ideal district size in those districts.

Chapters 625 and 632 (Algood)

|  | Before Enactment | | After Enactment | |
| --- | --- | --- | --- | --- |
|  | Population | % Variance | Population | % Variance |
| District 64 | 39,106 | − 1.34 | 39,501 | − 10.43 |
| District 67 | 39,826 | + 0.47 | 39,544 | − 0.23 |
| District 68 | 40,058 | + 1.05 | 36,844 | − 7.04 |
| District 69 | 39,481 | − 0.39 | 40,834 | + 3.01 |
| District 74 | 39,910 | + 0.68 | 33,770 | − 14.80 |
| District 75 | 39,119 | − 1.30 | 47,871 | + 20.77 |
| District 76 | 79,009 | − 0.34 | 82,823 | + 4.47 |
| District 77 | 79,009 | − 0.34 | 82,823 | + 4.47 |
| District 78 | 39,178 | − 1.16 | 38,500 | − 2.87 |

As in the *Sullivan* case, the reapportionment legislation at issue in *Algood* has markedly increased population disparities among the affected legislative districts. In the *Algood* districts, the maximum percentage variance was increased from 2.39 percent to 35.57 percent.

■ For the reasons stated with regard to the *Sullivan* case, we find that Chapters 625 and 632 of the Public Acts of 1976 unconstitutionally infringe plaintiffs' Fourteenth Amendment rights by reducing population equality in voting districts for no discernible legitimate reason.

The *Algood* plaintiffs also assert that the combination of House Districts 76 and 77 into a single two-member district violates the Tennessee Constitution as well as the federal Constitution.

■ Plaintiffs argue that the General Assembly's combination of Districts 76 and 77 into a single multi-member district, following the decision in *Kopald v. Carr*, 343 F.Supp. 51 (M.D.Tenn.1972), was in effect part of a court-ordered reapportionment plan. A court-ordered plan of apportionment may not include the use of multi-member districts, absent a compelling state interest justifying the use of such districts. *Connor v. Finch*, 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977); *Chapman v. Meier*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975).

■ However, we conclude that under the circumstances presented here, we are dealing with a legislative plan of apportionment, and not a court-ordered plan. It is true that the *Kopald* decision held the apportionment plans adopted by the General Assembly following the 1970 census unconstitutional, and required that the 1972 elections, which shortly followed the *Kopald* decision, be held under an alternative apportionment scheme provided by the legislature and modified by the court to meet constitutional deficiencies. However, the *Kopald* court expressly ruled that such scheme of apportionment would be effective only for the 1972 elections. The court retained jurisdiction of the cause and stated that

If the General Assembly enacts a plan of reapportionment prior to July 1, 1973, and such plan is not challenged in this case within thirty (30) days after the signing thereof by the Governor, this case will be closed. If, however, no plan is so enacted, or, if enacted, is successfully

challenged, the court will formulate a reapportionment plan.

*Kopald v. Carr,* supra, at 54.

Subsequently, the General Assembly did enact a plan of apportionment. Chapter 161, Public Acts of 1973.[3]

That plan was not challenged in the *Kopald* case, and the *Kopald* court therefore had no occasion to formulate its own plan of apportionment.

■ Plaintiffs concede that where a plan of apportionment is drawn by the legislature rather than by the courts, multi-member districts are not unconstitutional, absent a showing that the legislature has attempted to dilute the voting strength of some racial or political minority.[4] No such showing was made in this case. Accordingly, the use of a multi-member district for House Districts 76 and 77 does not violate the federal Constitution.

However, the use of a multi-member legislative district flies in the face of Article II, Section 5 of the Tennessee Constitution:

Section 5. Number of Representatives—Apportionment.—The number of Representatives shall be ninety-nine and shall be apportioned by the General Assembly among the several counties or districts as shall be provided by law. *Counties having two or more Representatives shall be divided into separate districts. . . .* [Emphasis added.]

■ This question of constitutionality under the state constitution does not fall within this court's limited jurisdiction under 28 U.S.C. § 2284(a) to hear actions "challenging the constitutionality of . . . the apportionment of any statewide legislative body," since such jurisdiction is limited to federal constitutional claims.

■ However, we have determined that in the circumstances presented, the state constitutional claim falls within the pendent jurisdiction of this court. Moreover, we have determined that we should exercise such jurisdiction, although of course we are not required to do so in every case where pendent jurisdiction exists.

Federal courts have pendent jurisdiction over state law claims

wherever there is a claim "arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . .," . . . and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case." The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. . . . The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole. [Citations omitted.]

*United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

In the case at bar, plaintiffs have presented substantial federal constitutional issues as to the numerical apportionment of voters and also as to the use of a multi-member legislative district in the peculiar factual situation involved. The state law claim, of course, challenges the use of the multi-member district on a different ground. We conclude that the state and federal claims presented here are derived from a common nucleus of operative fact, and that they would ordinarily be expected to be tried together. Accordingly, pendent jurisdiction exists under the *Gibbs* standards.[5]

---

3. The provision combining House Districts 76 and 77 into a single multi-member district is codified at T.C.A. § 3–103(b).

4. See *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971).

5. In reaching this conclusion, we are also mindful of the decision of the Sixth Circuit in *Seals v. Quarterly County Court,* 526 F.2d 216 (6th Cir. 1975).

■ It should be noted that the pendent jurisdiction of a properly convened three-judge court is measured by the same standards applicable to a one-judge district court, although in some instances remand of the pendent state claims to a single district judge is appropriate. *White v. Regester,* 412 U.S. 755, 761, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Rosado v. Wyman,* 397 U.S. 397, 402–403, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *United States v. Georgia Public Service Comm'n,* 371 U.S. 285, 287–88, 83 S.Ct. 397, 9 L.Ed.2d 317 (1963); *Florida Lime & Avocado Growers, Inc. v. Jacobsen,* 362 U.S. 73, 80 S.Ct. 568, 4 L.Ed.2d 568 (1960).

■ Pendent jurisdiction is, of course, a matter of discretion and not of right, and such jurisdiction need not be exercised wherever and whenever it is found to exist. Rather, the court must consider the factors of judicial economy, convenience, fairness to litigants, and comity in determining whether to exercise jurisdiction over state claims. *United Mine Workers v. Gibbs, supra,* 383 U.S. at 726, 86 S.Ct. 1130. However, the Supreme Court has indicated that where economy and convenience would be served, and no threat to fairness is present, the federal court should normally proceed to adjudicate pendent state claims. *Hagans v. Lavine,* 415 U.S. 528, 545–46, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

In the case at bar, judicial economy and convenience would clearly be served by disposing of these issues now. Fairness and comity considerations would not appear to require abstention, since the state constitutional provision involved is plain on its face and involves no difficult issues of construction, and since this court is aware of no pending state litigation regarding this matter.

We have previously noted that in some instances it is appropriate for a three-judge court to remand a pendent state law issue to a single district judge for decision. The Supreme Court observed in *Rosado v. Wyman, supra,* 397 U.S. at 403, 90 S.Ct. 1207, that such remand may be an appropriate way to preserve judicial time by allowing a single judge to resolve matters which are not required to be determined by a three-judge court.

We do not follow such a course here only because the record before this three-judge court is complete and the state law issue presented is a straight-forward one. No loss of judicial time will result from this court's decision to resolve the state constitutional claim itself, rather than remanding it for consideration by a single judge.

We believe the meaning of Article II, Section 5 of the Tennessee Constitution to be plain. That provision requires that multi-member districts be divided into separate districts.

Accordingly, we hold that the combination of House Districts 76 and 77 into a two-member district violates Article II, Section 5 of the Tennessee Constitution.

NELSON

Apportionment among House Districts 13, 14, 15, 16, 17, 18 and 19 was altered by the enactment on March 19, 1976 of Chapter 835 of the Public Acts of 1976.

The effects of Chapter 835 on voter distribution within those seven districts are demonstrated in the following table, which reflects changes in real population and in percentage variance from ideal district size:

Chapter 835 (Nelson)

|  | Before Enactment | | After Enactment | |
|---|---|---|---|---|
|  | Population | % Variance | Population | % Variance |
| District 13 | 39,560 | – 0.20 | 39,055 | – 1.47 |
| District 14 | 39,441 | – 0.50 | 39,694 | + 0.14 |
| District 15 | 39,205 | – 1.09 | 38,836 | – 2.02 |
| District 16 | 40,389 | + 1.89 | 42,399 | + 6.97 |
| District 17 | 39,651 | + 0.03 | 39,332 | – 0.77 |
| District 18 | 39,113 | – 1.32 | 39,539 | – 0.25 |
| District 19 | 38,600 | – 2.62 | 37,441 | – 5.54 |

As in the other two cases, the legislation at issue in *Nelson* has resulted in greater population disparities among the affected legislative districts. Maximum percentage variance was increased from 4.51 percent to 12.51 percent. This increase in malapportionment, if done for no good reason, would

be unconstitutional for the reasons stated with regard to the *Sullivan* case.

However, it should be noted that the maximum percentage variance in the *Nelson* case (12.51 percent) is well below the 21.78 percent and 35.57 percent figures found in the *Sullivan* and *Algood* cases, respectively.

Moreover, whereas in *Sullivan* and *Algood* this court is unable to perceive any rational state policy justification for increasing population differentials among districts, the *Nelson* case stands in a different light. At least part of the justification for the reapportionment effected by Chapter 835 was the elimination of so-called "split precincts" in the affected legislative districts. Split precincts are precincts in which voters from two different legislative districts are required to vote at the same polling place. The parties are in agreement that split precincts result in confusion among voters, delays and long lines at polling places, and added expense to the state for additional voting machines.

Plaintiffs argue that the elimination of split precincts has not heretofore been recognized as a legitimate reason for increasing malapportionment among legislative districts, and that this court should not become the first to do so. After consideration, however, we are of the opinion that the elimination of split precincts would be a valid reason for increasing population disparities among legislative districts to the 12.51 percent level demonstrated here, if no alternative creating less severe imbalances is available.

We note that the Supreme Court approved a state legislative reapportionment creating even greater differences among voting districts, where the state justification for the population disparities was the preservation of traditional political subdivisions. In the same case, the court reaffirmed the principle that more flexibility in population variance is permissible in state legislative apportionment than in the apportionment of Congressional districts. *Mahan v. Howell*, supra.

■ Plaintiffs have submitted a proposed alternative reapportionment plan in the *Nelson* case, which purportedly would eliminate split precincts while maintaining much lower population variances among districts. If such a plan is possible, then the present scheme would be unconstitutional, since it would fail to meet the requirement that

"a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable,"

*Reynolds v. Sims*, supra, 377 U.S. at 577, 84 S.Ct. at 1390. The elimination of split precincts cannot serve as a justification for malapportionment if it is possible to eliminate split precincts while maintaining legislative districts of more nearly equal population.

Unfortunately, we are not able to determine on the present record whether the plan presented by plaintiffs would in fact eliminate split precincts without causing malapportionment of the same magnitude as that introduced by the challenged legislation, or whether some other plan would achieve that result.

Additionally, we are aware that this matter has already been brought to the attention of the General Assembly. Senate Journal, 89th General Assembly, 2nd Sess., 2448–49 (March 19, 1976) (Statement of Senator Ashe).

■ Under these circumstances, mindful of the principle that legislative reapportionment is primarily a legislative function, we have determined that this court should retain jurisdiction over this aspect of the *Nelson* case but stay its hand in order to permit the General Assembly to study the matter and to take appropriate legislative action.

■ The *Nelson* plaintiffs also challenge the practice of the Knox County Election Commission in permitting some voters to remain registered in voting precincts in which they do not live. This situation exists because in years past, the Commission has permitted voters to register in any precinct within their civil district, whether or

not that precinct falls within the legislative district in which they live.

Since June, 1977, all new voters and all voters who change registration have been registered in the precincts in which they live. Additionally, some of the misregistrations for voters in precincts within the City of Knoxville were corrected by obtaining information from voters who voted in the November, 1977 city elections. The Commission intends to make similar corrections for precincts outside the City of Knoxville at the May, 1978 primary elections. There are no concrete plans to correct misregistrations before the May, 1978 primary elections, nor are there any concrete plans to correct misregistration of voters who did not vote in the November, 1977 city elections and who will not vote in the May, 1978 primary elections.

The misregistration of voters could theoretically lead to actual disparities in population among the affected legislative districts, even if the districts appear to be evenly apportioned on paper. However, on the present record it is not possible to determine the number of voters who are now registered in precincts outside their proper legislative districts. Accordingly, it is not possible to determine the severity of voter imbalance, if any, caused by misregistration.

Neither the federal constitutional challenge to the practice of the Commission, nor the state statutory challenge to that practice, falls within this court's jurisdiction under 28 U.S.C. § 2284(a).[6] However, we conclude that such issues do fall within the pendent jurisdiction of the court.

The effects of Chapter 835 and the effects of voter misregistration on the voting rights of persons within the affected legislative districts are inextricably intertwined. It would make little sense for this court, the General Assembly, or the state courts to consider the dilution of voting rights caused by the adoption of Chapter 835 without also considering the possible additional dilution caused by misregistration. For example, it would be entirely possible that the degree of malapportionment resulting from Chapter 835 would be within constitutional limits, while the combined impact of Chapter 835 and voter misregistration would create a constitutionally impermissible level of malapportionment.

We conclude that the federal constitutional challenge and the state statutory challenge to voter misregistration in Knox County, and the federal constitutional challenge to Chapter 835, derive from a common nucleus of operative fact and comprise a single constitutional case, which one would normally expect to be tried in a single judicial proceeding. Accordingly, the challenges to voter misregistration fall within this court's pendent jurisdiction even though they would not independently fall within our jurisdiction under 28 U.S.C.

**6.** Some doubt exists concerning the scope of the jurisdiction granted a three-judge district court in apportionment cases, following Congressional repeal of 28 U.S.C. §§ 2281 and 2282, and amendment of 28 U.S.C. § 2284, in 1976. See Act of Aug. 12, 1976, Pub.L. No. 94–381, 90 Stat. 1119. Prior to such Congressional enactment, it was clear that § 2281 provided three-judge court jurisdiction only where a state statute was challenged, and not where a non-statutory practice was concerned.

§ 2284(a) now provides, however, for the convening of a three-judge court where "an action is filed challenging the constitutionality of . . . *the apportionment of any statewide legislative body*." [Emphasis added.] The argument could be made that this enactment expanded the role of the three-judge court in apportionment cases to include hearing challenges to apportionment practices as well as apportionment statutes. However, we conclude that the Congress did not intend to require a three-judge court in the state legislative apportionment context except where a constitutional challenge is made to a statute involving "the apportionment of [a] statewide legislative body." This construction is borne out by the legislative history of the 1976 amendments:

Subsection (a) would also continue the requirement for a three-judge court in cases challenging the constitutionality of any statute apportioning congressional districts or apportioning any statewide legislative body.

S.Rep. No. 204, 94th Cong., 2d Sess. 12, reprinted in 1976 U.S.Code & Admin.News, pp. 1988, 2000. It is also consistent with the general purpose of the Act, which was to reduce the burden on the federal courts by reducing the number of cases calling for three-judge district courts.

§ 2284. *United Mine Workers v. Gibbs,* supra; *Seals v. Quarterly County Court,* supra.

We further conclude that because of the interrelationship between the claims, a serious danger of unfairness to the litigants would result should this court choose either to abstain from exercising jurisdiction, or to remand these issues to a single district judge. The same court should decide all the issues in this case. It would therefore be an abuse of our discretion to decline to exercise pendent jurisdiction in these circumstances.

On the present record, as noted above, we are not able to determine the degree to which misregistration affects the distribution of voters among legislative districts in Knox County. Therefore, we are not able to determine whether any resulting imbalance, alone or in combination with the population differentials introduced by Chapter 835, is outside the constitutionally acceptable range.

If plaintiffs challenged voter misregistration in Knox County only on federal constitutional grounds, on the current state of the record we would be tempted to follow the course we have taken with regard to the constitutional challenge to Chapter 835. We would retain jurisdiction over the matter but stay our hand in order to permit the possibility of legislative investigation and action by the General Assembly.

However, plaintiffs also challenge voter misregistration under T.C.A. § 2–207, which reads as follows:

> *A person may only be registered as a voter of the precinct in which he is a resident.* If a voter moves his habitation outside the precinct where he is a registered voter but continues to be a resident of the precinct, the county election commission shall determine his rights and duties on the basis of the location of his last residence in the precinct before his change of habitation. [Emphasis added]

This 1972 enactment of the General Assembly is clear and unambiguous. We note that resolution of this issue on state statutory grounds will permit this court to avoid resolution, either now or in the future, of a difficult federal constitutional issue. See *Siler v. Louisville & Nashville R. Co.,* 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed.2d 753 (1909).

Accordingly, we hold that it is unlawful for the Knox County Election Commission to allow persons to remain registered as voters of precincts in which they are not residents.

While we recognize that the process of checking and correcting voter registration in Knox County will involve some inconvenience and expense, we find no acceptable alternative. It appears from the record that it will be possible to accomplish much of the work by computer rather than manually. In other cases, it may be necessary to solicit additional information from voters by mail or otherwise.

CONCLUSION

In the *Sullivan* case, we have determined that Chapter 304 of the Public Acts of 1977 is unconstitutional. The *Sullivan* defendants will therefore be enjoined from conducting any election pursuant to the scheme of apportionment enacted in Chapter 304, and from certifying the results of any such election.

In the *Algood* case, we have determined that Chapters 625 and 632 of the Public Acts of 1976 are unconstitutional. The *Algood* defendants will be enjoined from conducting any election pursuant to the scheme of apportionment enacted in Chapters 625 and 632, and from certifying the results of any such election.

In addition, we have found that T.C.A. § 3–103(b) and Chapter 625, Section 6 of the Public Acts of 1976 violate the Tennessee Constitution insofar as they provide for a multi-member legislative district in House Districts 76 and 77. The *Algood* defendants will therefore be further enjoined from conducting any election pursuant to a scheme of apportionment which places present House Districts 76 and 77 in a single multi-member district, and from certifying the results of any such election.

In the *Nelson* case, we have determined that the practice of the Knox County Election Commission in permitting persons to

remain registered as voters of precincts in which they are not residents violates T.C.A. § 2–207. The *Nelson* defendants will be enjoined from conducting any election in which the practice of the Knox County Election Commission in permitting persons to remain registered as voters of precincts in which they are not residents would permit such voters to vote in precincts in which they are not residents, and from certifying the results of any such election. Additionally, we have decided to retain jurisdiction in the *Nelson* case as to the constitutionality of Chapter 835 of the Public Acts of 1976, pending possible legislative study and action by the General Assembly.

The costs of these actions, including a reasonable attorneys fee pursuant to 42 U.S.C. § 1988, will be taxed against the defendants in each case. This court will refer the question of the amount of attorneys fees to be awarded to the magistrate for hearing and determination. The attention of the magistrate is directed to the fact that counsel for plaintiffs here were also counsel for plaintiffs in *White v. Crowell, supra,* recently heard and determined by these judges, and that most of the legal research applicable to *White* was also applicable in *Sullivan, Algood,* and *Nelson.*

The Clerk will enter a judgment, including appropriate injunctive relief, consistent with this opinion.