STATE of Tennessee ex rel. W. B. LOC-
KERT, Jr., District Attorney General for
the 21st Judicial Circuit and Tom P.
Thompson, Jr., District Attorney Gener-
al for the 5th Judicial Circuit, Bill Jim
Davis, Cheatham County, and Wilson
County, K. Dickson Grissom, Denis Dozi-
er Haile, George H. Harding and Don
Simpson, individually and in his official
capacity as County Judge of Wilson
County, Tennessee (and each as individ-
ual plaintiff as well as relator), Plain-
tiffs-Appellees,

v.

Gentry CROWELL, Secretary of State of
the State of Tennessee; Lamar Alexan-
der, Governor of the State of Tennessee;
William M. Leech, Jr., Attorney General
of the State of Tennessee; David Col-
lins, Coordinator of Elections of the
State of Tennessee; and James E. Harp-
ster, Jack C. Seaton, Tommy Powell,
Richard Holcomb, and Lytle Landers,
Commissioner of the State Board of
Elections, Defendants-Appellants.

Supreme Court of Tennessee,
at Nashville.

March 31, 1982.

Robert T. Rochelle, Lebanon, Robert L. Perry, Jr., Ashland City, Henry Haile, Nashville, for plaintiffs-appellees.

Carol L. McCoy, Nashville, for amicus curiae, League of Women Voters of Tenn.

James E. Lanier, Dyersburg, for amicus curiae, Dyer County.

Robert B. Littleton, Sp. Asst. Atty. Gen., and Michael Catalano, Asst. Atty. Gen., Nashville, for defendants-appellants.

Richard H. Dinkins, Nashville, Jack Greenberg, James M. Nabrit, III, and Napoleon Williams, Legal Defense Fund New York City, for amicus curiae, Tennessee Voters Council and Unincorporated Ass'n by its General Chairman Avon N. Williams, Jr.

## OPINION

DROWOTA, Justice.

This case comes to us on direct appeal [1] from the Chancellor's grant of plaintiffs' motion for summary judgment. The primary question presented is the constitutionality of the Senate Reapportionment Act of

---

1. Jurisdiction of this appeal is in the Supreme Court pursuant to T.C.A. § 16–4–108.

1981,[2] which Act reapportioned the State Senate in response to the 1980 federal decennial census, as required by Art. II, § 4 of the Tennessee Constitution. The defendants cite as error the Chancellor's holding that the Act "contravenes Article II, § 6 of the Tennessee Constitution providing that no county shall be divided in forming a senate district, and the contravention of Art. II, § 6 is not necessary to meet the 'one person, one vote' requirement of the equal protection clause of the Fourteenth Amendment to the United States Constitution" and is therefore unconstitutional. The Chancellor also enjoined the defendants from conducting any primary or general election under the Act. For reasons set out below, we hold that this was not a proper case for summary judgment and we remand this cause to the trial court for further proceedings consistent with this opinion.

### HISTORY AND BACKGROUND

The action was brought on November 17, 1981, by the following plaintiffs: the counties of Wilson and Cheatham, by their District Attorneys General; the Senator representing District 27 under the prior apportionment act, whose incumbency was in effect abolished by the Act; and citizens and registered voters of Bedford, Cheatham and Wilson Counties, one of whom was a Wilson County Commissioner and another of whom was Wilson County Judge and ex officio Chairman of the County Commission. The plaintiffs' standing to sue is not in issue. Defendants are the Secretary of State, Governor, Attorney General, Co-ordinator of Elections and Commissioners of the State Board of Elections.

The amended complaint alleged three causes of action. One of these was that in this reapportionment, district lines were redrawn and voters were transferred from odd to even numbered districts, and vice versa. The effect of this would be to preclude many voters from voting in a Senate race as frequently as every four years, contrary to Art. I, § 5 of the Constitution. The Chancellor held that this was a neces-

sary by-product of reapportionment and did not violate the Constitution.

Another cause of action was that the Act violated Art. II, § 3 of the Constitution in failing to number districts consecutively in a county having more than one senatorial district. The Chancellor reserved this issue in view of his holding that the Act was unconstitutional for another reason and that the Senate districts must be redrawn.

The third, and principal, cause of action was that the Act clearly violated Art. II, § 6 of the Constitution, which reads:

> The number of Senators shall be apportioned by the General Assembly among the several counties or districts substantially according to population, and shall not exceed one-third the number of Representatives. Counties having two or more Senators shall be divided into separate districts. In a district composed of two or more counties, each county shall adjoin at least one other county of such district; *and no county shall be divided in forming such a district.*

The emphasized phrase was in our original Constitution of 1796, and found in the subsequent Constitutions of 1835, 1870 and 1966.

The defendants moved for summary judgment based upon exhibits which showed that the Act complied with the "one person, one vote" requirements of the United States Constitution. Based upon population, the "ideal" district size of a 33-member Senate is 139,114, under the 1980 census. The greatest positive variance from this size was + .73%, and the greatest negative variance – .92%, for a total maximum variance of 1.65%. Thus, the plan was close to mathematical perfection. Defendants argued that if these requirements were met, there was no basis under the Tennessee Constitution on which to hold the Act invalid.

Plaintiffs filed a cross-motion for summary judgment based upon the complaint, certain stipulations by the parties, and affidavits. The stipulations included the following matters pertinent to the principal issue:

1. A map of the districts established under the Act.

2. A statement that the optimum district size for a 33-member Senate was 139,114.

3. Charts showing the population of each district under the Act, the population of each county and parts of counties in each district, the raw number and percentage variance of each district from ideal size, the total maximum variance, the distribution of variance, the average variance, and similar statistics agreed to be true.

4. A 30-member and a 31-member plan proposed by plaintiffs, which would not cross any county lines. The 30-member plan had an ideal district size of 153,025, and the total maximum variance was + 4.46% and − 5.98%, or 10.44%. The 31-member plan had an ideal district size of 148,101, with a total maximum variance of 13.82%.

5. A 33-member plan which crossed the lines of only Shelby, Davidson, and Knox Counties. Hamilton County was divided into two districts, but no part thereof was joined in a district with any other county. The total maximum variance of this plan was stipulated to be 9.99%.

6. A stipulation as to the instructions given to Mr. Frank D. Hinton, Director of Local Government, Office of Comptroller of the Treasury, by the Senate for his guidance in preparing proposed reapportionment plans: "(a) that all districts should be as near to mathematical perfection as possible, but at the same time the districts should split as few counties as possible;" (b) that districts should keep the same numbers they had previously had, or at least their odd or even numbered status; and "(c) that, if possible, no two (2) incumbents in the State Senate should be placed in the same district."

The defendants filed the affidavit of Frank D. Hinton, addressing the difficulties of drawing a 33-member plan which did not cross county lines. It stated that the primary problem arose in the four metropolitan counties because their populations are not multiples of the ideal population of 139,114. A chart set out the percentages of variance for each of these counties if no county lines were crossed, from a low variance of + 3.41% in Hamilton County to a high of + 14.89% in Knox County. It concluded that since each of these variances was positive, with the lowest of the four figures being 3.41%, "some of the multi-county districts will have a negative variance from optimum district size. Attempts to draw such a thirty-three member plan result in a total gross variance (combining greatest positive and greatest negative variance) of over 22%." [3]

The motions for summary judgment were argued February 9, 1982. On February 18, the Chancellor entered a Memorandum Opinion, and on February 23, his Decree.

In addition to the above-mentioned parties, the following have participated in the appeal from this Court as amici curiae: the League of Women Voters, the Tennessee Voters Council, and Dyer County through its County Attorney.

## JUSTICIABILITY

■ A threshold issue decided by the Chancellor and appealed by the defendants is that the complaint presented a justiciable issue. The defendants charge that reapportionment is nonjusticiable because it is a political question and because it is a legislative function under the Separation of Powers Doctrine. They further argue that, should the courts declare the Act unconstitutional and the General Assembly fail to pass a constitutional act, the courts would be without power to grant the ultimate remedy of formulating their own reapportionment plan.

In view of the evolution in this area of constitutional law which has taken place since the United States Supreme Court's decision in *Baker v. Carr*, 369 U.S. 186, 82

---

**3.** Mr. Hinton's figures, and the manner in which we conclude he arrived at them, are discussed in footnote 5 of this opinion.

S.Ct. 691, 7 L.Ed.2d 663 (1962), we disagree, and affirm the Chancellor's holding that this is a justiciable issue. *See Egan v. Hammond*, 502 P.2d 856, 865 (Alaska 1972); *Legislature of the State of California v. Reinecke*, 10 Cal.3d 396, 110 Cal.Rptr. 718, 516 P.2d 6 (1973); *White v. Anderson*, 155 Colo. 291, 394 P.2d 333 (1964); *Guntert v. Richardson*, 47 Haw. 662, 394 P.2d 444, 449 (1964); *Butcher v. Bloom*, 415 Pa. 438, 203 A.2d 556, 559–560 (1964); *Smith v. Craddick*, 471 S.W.2d 375 (Tex.1971); *In re Senate Bill 177*, 130 Vt. 358, 294 A.2d 653 (1972); *State v. Zimmerman*, 22 Wis.2d 544, 126 N.W.2d 551, 560–563 (1964); 25 Am. Jur.2d *Elections* § 32 (1966); 16 C.J.S. *Constitutional Law* § 147 (1956). These and other cases relied upon in this opinion are replete with statements that apportionment is primarily a legislative function, and that the courts should act only if the legislature fails to act constitutionally after having had a reasonable opportunity to do so. If the court were forced in such an event to devise its own constitutional plan, it would not in effect be preempting the General Assembly.

## CONTENTIONS OF THE PARTIES

Plaintiffs contend that they made out a prima facie case of unconstitutionality, because the Act crossed the boundaries of 16 of the State's 95 counties in setting up the thirty-three Senate districts. Plaintiffs take the position that there is no unavoidable conflict between the Tennessee constitutional prohibition against dividing counties in forming Senate districts and the one person, one vote requirement of the federal constitution, if the number of Senators is reduced. Plaintiffs introduced two plans reducing the number of senatorial districts to 31 and 30, which plans had maximum total variances of 13.82% and 10.44% respectively. Plaintiffs aver that neither of these plans crosses any county lines and the variances in both plans meet the equal protection requirements.

Defendants contend that the division of counties is necessary to comply with the "one person, one vote" doctrine under the equal protection clause of the Fourteenth Amendment of the United States Constitu-

tion, as enunciated in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and as applied to state legislative bodies by *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1963).

The Senate reapportionment plan with a maximum variance of 1.65% is close to mathematical perfection. The plan divides sixteen counties. A thirty-three Senator plan which conforms to Art. II, § 6 and does not divide counties would produce a total variance of over 22%. Such a variance, defendants argue, is far above the maximum deviation permitted by the equal protection clause. Defendants submit that there is an unavoidable conflict between the equal protection clause and the provisions of Art. II, § 6 of our State Constitution, and the Senate chose a plan which complied with the equal protection clause.

Defendants aver that the two proposed apportionment plans submitted by the plaintiffs to the trial court substantially increase disparities in population over the present plan. Defendants contend that reducing the size of the Senate may raise serious constitutional questions relative to the representation of minorities within the Senate. Defendants further aver that the determination of the number of Senators is vested solely in the General Assembly and imposition of such a plan would abridge the Doctrine of Separation of Powers.

Amicus curiae, the Tennessee Voters Council, contends that minority groups which are concentrated within a specific area of a county, which now have representation in the State Senate, should not be stripped of representation, by the adoption of a 30 or 31 member Senate plan.

Amici curiae, League of Women Voters of Tennessee and Dyer County, seek affirmance of the Chancellor's decision holding the Act unconstitutional.

## STATE AND FEDERAL CONSTITUTIONAL REQUIREMENTS FOR REAPPORTIONMENT PLANS

### A. Equal Protection—"One Person, One Vote"

■ There are several constitutional standards which the Legislature must con-

sider in adopting a reapportionment plan. First and foremost is the requirement of equality of population among districts, insofar as is practicable. *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); *Reynolds v. Sims, supra; Clements v. Valles,* 620 S.W.2d 112 (Tex.1981); *Smith v. Craddick,* 471 S.W.2d 375 (Tex.1971). Not only is this required by the Fourteenth Amendment of the United States Constitution, but also it is required by Art. II, §§ 4 and 6 of the Tennessee Constitution.

Under the Act, the General Assembly created senatorial districts with a maximum total variance between the largest and smallest districts of only 1.65%. It should be remembered that variances larger than this would be constitutional. Indeed, the United States Supreme Court in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and *Gaffney v. Cummings, supra,* held that those attacking the state apportionment plans had failed to show a prima facie equal protection violation where the maximum total variances were 9.9% in *White,* and 1.81% for the Connecticut Senate and 7.83% for the House in *Gaffney.* In *Mahan v. Howell, supra,* the Court held that a larger total variance may be constitutional if it is justified in order to further a rational state policy. In particular, a variance of 16.4% was validated for the Virginia House of Delegates when the state's purpose therefor had been to maintain the integrity of traditional county and city boundaries. The Court in *Reynolds v. Sims, supra,* recognized the validity of maintaining political subdivision lines as justifying deviation from mathematical perfection in drawing state (as opposed to congressional) legislative districts.

▇ From these cases, a "rule of thumb" appears to have developed, whereunder variances of 10% or less need not be justified absent a showing of invidious discrimination; and greater variances will be constitu-

tional if the state has a rational policy in support thereof. Virginia's 16.4% variance is the greatest which, to our knowledge, has been found constitutional, and the court in *Mahan* speculated that this approached the limit of constitutional variance. Apportionment statutes with variances greater than this have been struck down, *see Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); *Kilgarlin v. Hill,* 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967); *Swann v. Adams,* 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967).[4]

That is not to say that a plan with less than 10% variance must automatically be upheld in the face of an equal protection challenge. When the variance is less than 10%, the United States Supreme Court has held that there is no prima facie showing of unconstitutionality. Plaintiffs in such a case would have to prove more: that the plan invidiously discriminated. We also do not hold that any plan with a variance of up to 16.4% would be upheld merely because it did not cross county lines, and because 16.4% was upheld for Virginia. As the Court held in *Reynolds v. Sims, supra,* "What is marginally permissible in one State may be unsatisfactory in another, depending on the particular circumstances of the case." 377 U.S. at 578, 84 S.Ct. at 1390. It later noted in *Mahan v. Howell, supra,* quoting from *Swann v. Adams, supra,* "the fact that a 10% or 15% variation from the norm is approved in one State has little bearing on the validity of a similar variation in another State." 410 U.S. at 328, 93 S.Ct. at 987. It must be remembered that "the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Reynolds v. Sims, supra,* 377 U.S. at 577, 84 S.Ct. at 1390. "For a State's policy urged in justification of disparity in district population, however rational, cannot constitutionally be permitted to emasculate the goal of substantial

---

4. *Whitcomb v. Chavis,* Indiana reapportionment Act, 24.78% in the House and 28.2% in the Senate; *Kilgarlin v. Hill,* Texas plan, 26.58%; *Swann v. Adams,* Florida plan, 33.55% in the House and 25.65% in the Senate.

equality." *Mahan v. Howell, supra,* 410 U.S. at 326, 93 S.Ct. at 986.

■ Applying these principles to the reapportionment of the Tennessee Senate, we feel that the variance between largest and smallest districts could increase substantially in order to preserve county boundaries and comply with other constitutional standards. *See Sullivan v. Crowell,* 444 F.Supp. 606 (W.D.Tenn.1978), wherein a reapportionment among several House districts increased the variance from 4.51% to 12.51% in order to avoid having voting precincts wherein voters were in two districts. The court held that this was a valid reason for increasing the variance. However, if a plan could be devised which would achieve the same end while maintaining much lower variances, the 12.51% variance would be unconstitutional. Yet the equal protection factor should certainly not be thrown to the winds. Specifically, the record indicates that the best 33-Senator plan which can be drawn without crossing any county lines would have a maximum total variance of over 22%.[5] We cannot conceive of such a plan being held constitutional. The one person, one vote principle would require a variance of substantially less than this.

## B. Dilution of Minority Voting Strength

There is a second issue which, like the equal protection issue, falls under the United States Constitution. This is the issue, raised for the first time on appeal to this Court by amicus curiae Tennessee Voters Council, an unincorporated association, by the General Chairman Avon N. Williams, Jr., of whether or not the Act is "a necessary means for avoiding an unlawful dilution of minority voting strength." Many United States Supreme Court cases have dealt with the argument that a certain form of legislative districting, usually at-large, multi-member districting, has resulted in unconstitutional dilution of minority voting strength. *See, e.g., City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); and cases cited therein. These cases contain instructive statements as to what constitutes invidious discrimination in this area, and what does not.

■ At the hearing on remand, evidence should be heard concerning whether or not minorities are invidiously discriminated against by any of the apportionment plans before the court; and whether, assuming that the Act does not invidiously discriminate, any alternative apportionment plan can be drawn which also does not invidiously discriminate and yet conforms to the guidelines for constitutionality under the Tennessee Constitution set forth herein.

## C. Prohibition Against Crossing County Lines, Article II, § 6

■ The first two requirements discussed in Sections A and B dealt with state and federal constitutional standards. Not dividing county lines is solely a state requirement. If there is an unavoidable conflict between federal and state requirements as

---

5. The affidavit of Frank D. Hinton stated that the major problem with variance in a 33-member plan not crossing county lines is in the major metropolitan counties. Dividing their populations under the 1980 census by the ideal district population of 139,114, the Court can see that Shelby County would be entitled to 5.6 Senators; Davidson County to 3.4; Knox County to 2.3; and Hamilton County to 2.1. If Shelby County were given 5 Senators, each would represent 155,423 people, or 11.72% above the norm. If it were given 6, each would represent 129,519 people, or 6.9% below the norm. If Davidson County were given 3 Senators, each would represent 159,270 people, or 14.49% above the norm. If it were given 4 Senators, each would represent 119,453 people, or 14.13% below the norm. If Knox County were given 2 Senators, each would represent 159,847 people, or 14.90% above the norm. If it were given 3 Senators, each would represent 106,565 people, or 23.4% below the norm. Since Hamilton County would qualify for 2.1 Senators, obviously it would be given 2, each of whom would represent 143,870 people, or 3.4% above the norm. These are figures which we can derive, and they correspond to figures used in the Hinton affidavit. The affidavit does not explain his conclusion that the least possible variance in such a plan is some 22%; however, all parties conceded this figure as the lowest possible total variance during oral argument.

defendants assert, then the state requirements become secondary to the necessity of complying with the equal protection clause. All of the parties erroneously assumed that the only constitutional alternative to the present Act, which crosses 16 county lines, is a plan which crosses no county lines whatsoever. It was shown in the trial court that at least one 33 Senator plan can be devised which crosses significantly fewer county lines than does the Act, and yet clearly meets the equal protection guidelines delineated above. The prohibition against crossing county lines should be complied with insofar as is possible under equal protection requirements. There are excellent policy reasons for the presence of a provision that counties must be represented in the Senate. *Mahan v. Howell, supra; Reynolds v. Sims, supra.* As the complaint in this case alleges:

> ... Counties are divided and thus their citizens are denied their constitutional right to be represented in the State Senate as a political group by senators subject to election by all voters within that political group. These plaintiffs aver that the legal and political framework of Tennessee allows and requires that the legislature enact legislation having only a local application. Thus the legislature has the ability through local legislation to directly affect citizens merely because those citizens reside in a particular county. Therefore, the legislature has the right to govern citizens in one county differently from citizens in another county.

We find very persuasive the law which has developed in Texas under the cases of *Smith v. Craddick*, 471 S.W.2d 375 (Tex. 1971) and *Clements v. Valles*, 620 S.W.2d 112 (Tex.1981). The pertinent provision of the Texas Constitution (Art III, § 26) dictated as follows:

1. Whenever a *county* has sufficient population to be entitled to a Representative, such *county* shall form a separate district.

2. When two or more *counties* are required to make up sufficient population for a district, they shall be contiguous.

3. When any *county* has more than sufficient population to be entitled to a Representative or Representatives, he or they shall be apportioned to that *county*. For any surplus population, it may be joined in a district with any other *county* or *counties.*

The court first held that the equal protection requirement took precedence, and "any inconsistency therewith in the Texas Constitution is thereby vitiated." 471 S.W.2d at 377.

When federal requirements were "superimposed," as it were, upon the above provisions, the following effects upon the State Constitution were had:

Clause 1: This would be effective only so long as county population was within the permissible limits of variance.

Clause 2: When two or more counties are needed to make up a district, "the only impairment of this mandate is that a county may be divided if to do so is necessary in order to comply with" the Fourteenth Amendment.

Clause 3: This was nullified. It became permissible to join the portion of a county in which there was surplus population not in a district wholly within the county, with contiguous area or another county to form a district. It was still necessary for a county to receive the number of districts to which its own population was entitled when the "ideal" population was equalled or exceeded.

It was clear that the court interpreted the language of its Constitution to mean that counties must be dealt with as a whole, and that it allowed that meaning to be softened only to the extent necessary to comply with the federal constitution.

The plan passed by the Texas Legislature in *Smith v. Craddick, supra,* cut the boundaries of 33 counties. Forty-three of one hundred fifty districts contained a portion of a county. As the court held:

> [Defendants] offered no evidence to establish that the wholesale cutting of county lines ... was either required or

justified to comply with the one-man, one-vote decisions. The burden is on one attacking an act to establish its invalidity. [Citations omitted.] [Plaintiffs] proved conclusively that the statute fails to do what is required by the constitution in those respects discussed ... above. No presumption of validity remains in the face of that showing. If these districting requirements were excused by the requirements of equal representation, the [defendants] had the burden of presenting that evidence. They presented none.

*Id.* at 378.

The apportionment plan struck down in *Clements v. Valles, supra,* also sets out the way in which the division of counties failed to comply with the *Smith v. Craddick* guidelines. These are analogous to the Tennessee Act. The Texas Act cut 34 counties, 24 with surplus population and 10 with insufficient population to form a district. The plaintiffs presented numerous alternative plans which more closely followed county lines and still maintained permissible population deviations.

In *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), the Supreme Court considered the constitutionality of a plan apportioning the Connecticut House. In Connecticut, towns rather than counties are the basic unit of local government. The state Constitution provides that "no town shall be divided" for the purpose of creating House districts, except where districts are formed "wholly within the town." The Constitution further provides, as does our own, that the "establishment of districts ... shall be consistent with federal constitutional standards." The House plan under scrutiny in *Gaffney* cut 47 boundary lines of the state's 169 towns. As in the case at bar, an action was brought seeking declaratory and injunctive relief against implementation of the plan.

The complaint alleged that the plan erroneously applied the Fourteenth Amendment so as to achieve smaller deviations from population equality for the districts than were required under the Fourteenth Amendment. In achieving such unneces-

sary mathematical precision, the plan segmented an excessive number of towns in forming the districts. At the hearing in the federal district court, plaintiffs introduced three alternative apportionment plans that required fewer town-line cuts, although all three plans involved total deviations from population equality in excess of the 7.83% contained in the House plan. A fourth alternative plan was submitted which had a maximum variation of only 2.61%, but had no regard for the integrity of town lines.

The district court invalidated the plan and enjoined its future use in elections. The Supreme Court stayed the district court's judgment and upheld the original plan, which violated the Connecticut Constitution's prohibition against crossing town lines. The Court made the following pertinent observations:

> ... From the very outset, we recognized that the apportionment task, dealing as it must with fundamental "choices about the nature of representation" [citation omitted], is primarily a political and legislative process....
>
> ....
>
> ... Politics and political considerations are inseparable from districting and apportionment....
>
> ....
>
> ... [M]ultimember districts may be vulnerable, if racial or political groups have been fenced out of the political process and their voting strength invidiously minimized.

412 U.S. at 749, 753, 754, 93 S.Ct. at 2329, 2331, 2332, 37 L.Ed.2d at 310, 312.

■ This case illustrates the point that, where necessary to meet federal constitutional requirements, a state constitutional provision may be violated to an extent, but still must be given due consideration and all possible effect.

### D. Contiguous and Consecutively Numbered Counties

■ In addition to the above requirements in Sections A, B and C, the courts must of course consider other factors in

passing upon the constitutionality of a state apportionment plan. The counties in each district must be contiguous (Art. II, § 6). In a county having more than one senatorial district, such districts shall be numbered consecutively (Art. II, § 3).

## NUMBER OF SENATORS

Another matter which must be addressed when considering state constitutional standards is the number of members which the Senate can contain under a constitutional plan. The stipulations made to the trial court included both a 30 and 31 Senator plan, neither of which crossed county lines. The variances were 10.44% and 13.82% respectively. The Chancellor noted these plans approvingly. We, however, see several problems which should be weighed when the Legislature is considering the advisability of changing the number of Senators.

■ Certainly, it would be constitutional for the Senate to contain fewer than 33 members. The Constitution, Art. II, § 6, sets only the maximum size of the Senate, at one-third the number of Representatives. However, the maximum number of Representatives has been set at 99 since the Constitution of 1835 [6] and the number of Senators has remained in actual practice one-third the number of Representatives. The Code of 1884 set the number of Representatives at 99 and the number of Senators at 33, and the same composition has existed in the House and Senate since that date.[7] The framers of the Constitution and the Legislature as early as 1884 sought stability in the General Assembly by fixing the specific number of Senators and Representatives. For nearly 100 years the composition of the Senate has not changed. Under plaintiffs' theory the number of Senators would likely increase or decrease after each decennial census. TCA § 3–1–101 expressly mandates that there shall be 33 Senators, and the validity of this statute has not been challenged in this action. Clearly, the statute evidences a legislative intent as to the number of Senators.

We contemplate another problem in reducing the number of Senators. Under either a 30 or 31 Senator plan, the Senator elected in the 32nd senatorial district in 1980 for a 4 year term, specified by Art. II, § 3 of our Constitution, would have his senatorial district abolished during his term of office. A more serious problem in reducing the number of Senators has been raised by amicus curiae, that is, that reducing the size of the Senate raises constitutional questions relative to the representation of minorities within the Senate. They contend that plaintiffs' 30 and 31 Senator plans unlawfully dilute minority voting strength, particularly in Shelby and Davidson Counties.

In our view, the decision as to the number of Senators belongs to the General Assembly; it is a political matter. Art. II, § 4. We shall not intrude upon the legislative prerogative, being mindful of the Doctrine of Separation of Powers under Art. II, §§ 1 and 2 of our Constitution. The General Assembly is perfectly free to reduce the number of Senators by amending TCA § 3–1–101, or keep the membership at 33, so long as the apportionment plan which it adopts otherwise meets constitutional standards.

## TENNESSEE FEDERAL COURT CASES FROM THE 1970'S

Mention should be made of federal district court cases decided during the 1970's

---

6. Number of Members of General Assembly in Constitution

| | House | Senate |
|---|---|---|
| 1796 | not less than 22 not more than 26 (11 counties) | not less than 1/3 not less than 1/2 |
| 1835 | not greater than 75 until population reaches 1.5 million, thereafter no greater than 99 | not greater than 1/3 |
| 1870 | same as in 1835 | same as in 1835 |
| 1966 | 99 members | same as in 1835 |

7. Composition of the General Assembly provided by statute:

| | House | Senate |
|---|---|---|
| Code of 1858, Art. IV, 91 (Acts of 1851 52, Ch. 197, § 4) | 75 | 25 |
| Code of 1884, Art. III, 114 | 99 | 33 |
| Code of 1896, Art. III, 123 | 99 | 33 |
| Acts of 1901, Ch. 122, § 2 | 99 | 33 |
| Acts of 1965 (E.S.), Ch. 3, § 2 (TCA § 3 1 101) | 99 | 33 |

and discussing Tennessee apportionment plans under the United States Constitution. These cases, in chronological order, are: *Kopald v. Carr*, 343 F.Supp. 51 (M.D.Tenn. 1972); *White v. Crowell*, 434 F.Supp. 1119 (W.D.Tenn.1977); *Sullivan v. Crowell*, 444 F.Supp. 606 (W.D.Tenn.1978); and *Mader v. Crowell*, 498 F.Supp. 226 (M.D.Tenn.1980).

Interestingly, Ch. 3, § 2 of the Public Acts of 1965, which was expressly designed as a response to *Baker v. Carr, supra*, did *not* divide counties. *Kopald* dealt with the General Assembly's first apportionment plan after the 1970 census, which was enacted in 1972 and actually consisted of a principal and an alternate plan. It was admitted that the principal plan, which did not cross county lines, was unconstitutional; and that the alternate plan, which crossed county lines, had over a 21% variance in the House, principally from malapportionment in Knox and Shelby Counties. The court made certain changes in these and Rutherford Counties, which brought the variance to well below 10%. It noted that apportionment was primarily a legislative function; that plaintiffs had submitted plans even more mathematically precise; but that the evidence showed that "the *lesser mathematical precision* of the [court's] plan may be justified on the basis of *legitimate state policy considerations*." 343 F.Supp. at 53–54 (emphasis added).

The opinion was issued May 22, 1972. The court's modified plan was effective for the 1972 elections, with the Legislature given until July 1, 1973, to devise a constitutional plan.

It is reflected in *White v. Crowell, supra*, that the Legislature passed the court-devised apportionment plan prior to July 1, 1973, deadline. This plan crossed county lines. *White* dealt with 1976 changes in three Senate ("Gillock Amendment") and three House districts in Shelby County. After the changes, the variance from ideal district size was increased, although even then the largest of the six variances was only +3.304%. The changes were challenged in May, 1976, so that court took no action at that time since primary elections were so close. The court found that the Legislature's reasons for making the changes were unjustified, so they were held unconstitutional. The case held that the variances of the six districts would have been constitutional if they had been part of the general 1973 reapportionment ordered in *Kopald*. However, the variances which resulted from the 1973 reapportionment were much smaller than the 1976 variances, thus demonstrating that the 1976 variances could be improved upon. Clearly the court was concerned with equal protection mandated by the federal constitution almost to the exclusion of all other considerations.

*Sullivan, supra*, was actually three consolidated cases, referred to as "*Sullivan*," "*Algood*" and "*Nelson*." The *Sullivan* case dealt with four House districts altered by a 1977 act; *Algood* dealt with nine House districts altered by two 1976 acts; and *Nelson* dealt with seven House districts altered by a 1976 act.

In *Sullivan*, the maximum total variance of the districts in question was increased from 2.34% to 21.78%; in *Algood*, it was increased from 2.39% to 35.57%. The court recognized that apportionment of state legislative districts was judged with a more flexible standard than congressional apportionment; and that fairly large variances are tolerated when they result from the even-handed implementation of a rational state policy. Here, the State's justification was to " 'put the counties back together' by taking a small number of magisterial districts of a county and isolated in a legislative district and combining them with the larger number of other districts in the county to which they all belong." 444 F.Supp. at 610.

The court did not accept such an argument in that case because

the record does not show that these reapportionment measures have significantly reduced the division of magisterial districts in the affected counties. Nor does the record show an attempt by the State to effect a statewide policy of "putting the counties back together." On this record, the court does not find any relation-

ship between county unification and the reapportionment legislation before the court.

*Id.* at 611. Similarly, in *Algood*, there was "no discernible legitimate reason" advanced to justify so greatly increasing the variance in the affected district.

We agree with the court's holding in that the variances in *Sullivan* and *Algood* were significantly larger than any figure which has been held constitutional. Secondly, the creation of a huge variance would not be acceptable if only a few magisterial districts were unified. Third, the language implies that if the record had supported the argument that the State was truly trying to keep counties together, and if the variances had been smaller, the reapportionment could have been held constitutional.

In *Nelson*, maximum variance among the seven affected House districts was increased from 4.51% to 12.51%, a much smaller increase. Also, at least part of the justification for the change was to eliminate "split precincts"—precincts where voters from two legislative districts vote at the same polling place. There was no question that split precincts cause confusion, delays, long lines, and expenses for additional voting machines. Thus, the court held that their elimination "would be a valid reason for increasing population disparities among legislative districts to the 12.51 percent level demonstrated here, *if no alternative creating less severe imbalances is available."* *Id.* at 614 (emphasis added). It appeared that the plaintiffs had a plan which would also eliminage split precincts while maintaining lower variances. The General Assembly was instructed to study the matter and take appropriate action. "The elimination of split precincts cannot serve as a justification for malapportionment if it is possible to eliminate split precincts while maintaining legislative districts of more nearly equal population." *Id.*

The *Mader* case was brought in March, 1978, to challenge the 1973 reapportionment ordered in the *Kopald* case. The court issued its initial holding January 15, 1979, which is reported as Appendix A to the opinion of March 27, 1980, published at 498 F.Supp. 226. The 1979 opinion held the 1973 apportionment unconstitutional because the maximum total deviation thereunder was 18.03%, far greater than the approximately 4% deviation under the plan devised by the *Kopald* court, under which the 1972 elections had been held. The State was unable to justify the 18.03% deviation under the Legislature's plan. The court observed:

Although defendants point out that Article 2, section 6 of the Tennessee Constitution "prefers districts that contain whole contiguous counties," (Defendants' Reply Brief and Argument, filed November 3, 1978, at 7), defendants have failed to indicate how the plan under attack furthers this preference or even that the preference rises to the level of an established state policy. Tennessee Code Annotated section 3–1–102 creates a number of districts that cut across county lines, and several of these districts deviate markedly from the optimum. Although *Mahan [supra]* teaches that other policy considerations might justify exceptions to a general policy of observing existing political boundaries, no such justifications have been identified for the noncontiguous districts now existing in this state.

498 F.Supp. at 234.

The court gave the Legislature until June 1, 1979, to devise a new plan, and this deadline was complied with.[8] Under such new plan, maximum total variance was a mere .89%.[9] In the second case, plaintiffs made no equal protection challenge, but challenged the plan on two grounds not

---

8. The State had appealed the January order to the United States Supreme Court. The Court in light of the General Assembly's action, ultimately remanded the cause to the district court for such further proceedings as might be appropriate. *Crowell v. Mader*, 444 U.S. 505, 100 S.Ct. 992, 62 L.Ed.2d 701 (1980).

9. Under the plan, 22 county lines were crossed, and 20 Senate districts contained part of at least one county joined with at least one other county.

relevant in this appeal; in any case, their challenges were not upheld. Nothing further was said about districts crossing county lines.

## THE PROPRIETY OF SUMMARY JUDGMENT—AND OUR CONCLUSIONS

The Chancellor granted plaintiffs' motion for summary judgment "because the defendants have not demonstrated an unavoidable conflict between [the prohibition against dividing counties] of the State Constitution and the one person, one vote requirement of the federal Constitution." We cannot reach the same conclusion based upon the limited record before us.

 Plaintiffs showed that the Act violates the state's constitutional prohibitions against crossing county lines, Art. II § 6. The burden therefore shifted to the defendants to show that the Legislature was justified in passing a reapportionment act which crossed county lines. It was stipulated that the Senate reapportionment plan, which crosses county lines, has a maximum variance of 1.65%. This variance clearly meets the federal requirement of equality of population among districts.

The defendants aver and the plaintiffs concede that a 33 member apportionment plan, not crossing county lines, would result in a total gross variance of over 22%. We hold such a variance exceeds the maximum deviation permitted by the equal protection clause of the Fourteenth Amendment. We thus have an unavoidable conflict, unless we were to hold, based upon the bare conclusory evidence presented, that the 31 and 30 member plans, which cross no county lines, meet the federal constitutional requirements for reapportionment plans. It has been stipulated that these plans have maximum total variances of 13.82% and 10.44% respectively, which plans would in all probability meet the equality of population requirement of the state and federal constitutions. However, the record fails to establish whether either plan dilutes minority voting strength. This is a serious question, one which was raised by amicus curiae for the first time on this appeal, and one which has not been considered by the Chancellor.

 Whether the state made an honest and good faith effort to construct senatorial districts which comply with both federal and state constitutions is an issue of fact which we believe requires a full evidentiary hearing as does the question of justification. The parties should also be allowed to properly develop and present evidence on whether or not the Act is a necessary means for avoiding an unlawful dilution of minority voting strength.

We hold that this was not a proper case for summary judgment. There remained disputed questions of material fact as to whether the plan under the Act was actually necessary, in view of other action which the Legislature could have taken, in order to comply with paramount constitutional standards. This cause is therefore remanded to the Chancery Court of Davidson County, the defendants shall file their answer, and this cause shall proceed to a hearing on the merits.

As a guide to the trial court and the General Assembly we recapitulate our holding:

1. The population variance under the Act can be increased and still comply with equal protection standards. The variance should be as low as possible, because equality of population is still the principal consideration. The variance certainly should not be greater than any figure which has been approved by the United States Supreme Court; nor would such maximum figure automatically be approved, because the variance for any state will be judged solely by the circumstances present in that state.

2. Primary consideration must also be given to preserving minority strength to the extent required by United States Supreme Court cases cited above. The Chancellor should consider whether the reapportionment Act or any other plan unconstitutionally dilutes the opportunity of minorities to participate in the political process.

3. The provisions of the Tennessee Constitution, although of secondary import to

equal protection requirements, are nonetheless valid and must be enforced insofar as is possible. If the State is correct in its insistence that there is no way to comply with the mandates of the federal and state constitutions without crossing county lines, then we hold that the plan adopted must cross as few county lines as is necessary to comply with the federal constitutional requirements.

4. In addition to equal protection, preserving minority voting strength, and not crossing county lines, constitutional standards which must be dealt with in any plan include contiguity of territory and consecutive numbering of districts.

Although the law on this point is not fully developed, the cases indicate that political considerations are a reality and also have a place in the creation of legislative districts. *See White v. Weiser*, 412 U.S. 783, 791, 93 S.Ct. 2348, 2352–2353, 37 L.Ed.2d 335 (1973); *Gaffney v. Cummings, supra*, 412 U.S. at 752–753, 93 S.Ct. at 2331, 37 L.Ed.2d at 312. *But see Legislature of State of California v. Reinecke*, 10 Cal.3d 396, 110 Cal.Rptr. 718, 721–722, 516 P.2d 6, 10 (1973).

The order sustaining plaintiffs' motion for summary judgment is overruled and the cause remanded to the Chancery Court of Davidson County for further proceedings in accordance with this opinion. The injunction issued by the Chancellor enjoining the defendants from conducting any primary or general election under Chapter 538, Public Acts of 1981, is dissolved. The costs incident to this appeal will be divided equally between the parties; all other costs will be assessed by the trial judge.

HARBISON, C. J., and COOPER, J., concur.

FONES and BROCK, JJ., dissent.

FONES, Justice, dissenting.

We respectfully disagree with the majority's action in remanding this case for further proof on two issues. The record before us, even though meager, is sufficient to support, beyond dispute, the finding that Acts of 1981, Chapter 538, is unconstitution- · al. Nothing beyond redundancy can result from a remand for the purpose of obtaining an adjudication that it is possible or it is not possible to meet federal population equality guidelines without crossing county lines or that chapter 538 does or does not unlawfully dilute minority voting strength. No combination of findings on those issues would result in validating chapter 538.

The majority opinion contains a full and accurate analysis of all the legal principles relevant to this lawsuit. We are in full accord with all of the conclusions reached except those that are said to support a remand for trial and dissolution of the injunction.

We would hold chapter 538 unconstitutional because this record shows, beyond dispute, that the Legislature has not restricted its breach of county lines to the minimum necessary to comply with federal population requirements. The parties have stipulated and exhibited in this record a thirty-three member plan with a total variance of 9.99% with districts numbered consecutively, that crosses only three county lines. That plan meets all constitutional requirements, state and federal, except that a portion of Shelby, Davidson and Knox Counties are combined with adjoining districts. It is beyond question that the primary problem in complying with the equal population and the county line mandates is the fact that the populations of the four metropolitan counties are not exact multiples of 139,114. It follows that if it is impossible to draw a thirty-three member plan that meets the equal population mandate without splitting counties, the minimum county line violations would be obtained by combining with adjoining counties an area of the metropolitan counties with the largest fractional results obtained by dividing 139,114 into the total county population. That is exactly what the thirty-three member, three split county plan accomplishes.

The majority opinion holds that the Tennessee county line mandate is secondary to equal protection requirements, but cannot be breached beyond the extent necessary to

comply with the federal equal population guidelines. That principle was implicitly if not explicitly applied in *Smith v. Craddick*, 471 S.W.2d 375 (Tex.1971), and it is supported by unassailable reason and logic. It was also sanctioned in *Sullivan v. Crowell*, 444 F.Supp. 606 at 614.

The State insists that it is impossible to comply with the Federal Constitution as interpreted by Federal Courts without crossing county lines and the State relies on Frank Hinton's affidavit of February 11, 1982, as proof that a variance of 22% is the minimum obtainable, without breaching a single county line. Hinton's affidavit shows that Knox, Davidson and Shelby Counties produce a variance of + 14.89%, + 14.48% and + 11.71% respectively, from optimum district size, and that some of the multi-county districts will have a negative variance of approximately 7%, resulting in the gross variance of 22%. As the majority opinion points out, the plaintiffs concede the accuracy of Hinton's affidavit. Plaintiffs' concession as to the accuracy of that affidavit establishes as the law of this case, that Federal population guidelines cannot be met without crossing some county lines and points clearly to the necessity of crossing three of the four metropolitan county lines. Yet, the effect of the remand is to take proof and determine the issue of whether there is an unavoidable conflict between the state county line mandate and the Federal equal protection requirements.

Upon establishing, as this record does, that county lines must be breached to meet federal population requirements, the determinative issue of the constitutionality of chapter 538 is whether or not the State has made an honest and good faith effort to construct districts breaching as few county lines as practical to comply with federal population guidelines. The thirty-three member plan breaching only three county lines conclusively answers that question in the negative. Thus, the conclusion is inescapable that chapter 538 cannot meet the test of minimum violation of the state constitution and no finding on remand can change or alter that result.

We fully agree with all that the majority has said about avoiding unlawful dilution of minority voting strength. What, we ask, will be the result of finding on remand that chapter 538 was constitutional or unconstitutional, in that respect? It seems clear to us that chapter 538 is doomed and therefore its effect on minority voting strength is moot. Such an inquiry, and judicial determination would only be appropriate if all conceivable reapportionment plans that the Legislature might adopt would have an identical effect on minority voting strength, a proposition we can judicially notice as fallacious.

We agree that legislative reapportionment is primarily a legislative function and we believe the Legislature will reapportion itself, constitutionally under the State guidelines in the majority opinion and the Federal guidelines, so well reviewed and summarized therein. We would terminate this lawsuit with a judgment declaring chapter 538 unconstitutional, enjoin the holding of an election thereunder and give the Legislature the opportunity to accomplish that before the 1982 elections.

BROCK, J., concurs in this dissent.